**LAW OFFICES OF ERIC A. SHORE**          *Counsel for Plaintiff*
By: <u>CHARLES M. SCOTT, ESQ.</u>
Attorney ID No.: 326926
2 Penn Center, Suite 1240
1500 Market Street
Philadelphia, PA 19102
(267) 262-8586
charless@ericshore.com

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARQUITA FRAZIER** | : | **COMPLAINT** |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 2:22-cv-4136 |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| **SERGEANT GREGORRIO SANTIAGO,** | : | |
| **CAPTAIN NASHID AKIL,** | : | |
| **LIEUTENANT BRENT CONWAY,** | : | |
| | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |

<u>**CIVIL ACTION COMPLAINT**</u>

Plaintiff, **MARQUITA FRAZIER**, by and through her counsel, The Law Offices of Eric A. Shore, hereby brings this civil action against Defendants **CITY OF PHILADELPHIA**, **SERGEANT GREGORRIO SANTIAGO, CAPTAIN NASHID AKIL, LIEUTENANT BRENT CONWAY**. Upon information and belief and in support thereof, Plaintiff alleges as follows:

<u>**INTRODUCTION**</u>

1.     This is an action seeking damages to remedy injuries Plaintiff has suffered, and continues to suffer, as a result of unlawful employment practices by the named Defendants against

Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e, *et seq.* ("Title VII")*;* and Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983").

## PARTIES

2.      Plaintiff **MARQUITA FRAZIER** (hereafter "Plaintiff") is an African American adult female and resident of the Commonwealth of Pennsylvania.

3.      Defendant, **CITY OF PHILADELPHIA** (the "City" or "Defendant") is a municipality of the Commonwealth of Pennsylvania.

4.      The City owns, operates, manages, directs and controls the Philadelphia Police Department (the "PPD"), which is the nation's fourth largest police department, with over 6300 sworn members and 800 civilian personnel. The PPD is the primary law enforcement agency responsible for serving Philadelphia County, extending over 140 square-miles in which approximately 1.5 million people reside.

5.      Geographically, the PPD is divided into twenty-one police districts (each headed by a Captain), which comprise six police divisions (Northwest, Northeast, East, Central, Southwest, South - each headed by a Divisional Inspector), into two major sections of the city, Regional Operations Command North (ROC North) and Regional Operations Command South (ROC South), each headed by one Chief Inspector under Patrol Operations. Personnel are assigned to work in 55 different locations throughout Philadelphia, with Police Headquarters located in the 6th Police District, in Center City, at 750 Race Street.

6.      There are eleven different ranks in the PPD in the following order, beginning at the entry level position of Police Officer and ending with Police Commissioner: (1) Police Officer; (2)

Detective; (3) Corporal; (4) Sergeant; (5) Lieutenant; (6) Captain; (7) Staff Inspector; (8) Inspector; (9) Chief Inspector; (10) Deputy Commissioner; and (11) Commissioner.

7.     Defendant **SERGEANT GREGORRIO SANTIAGO** (hereafter "SANTIAGO") is an adult male individual and citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

8.     At all times material, SANTIAGO acted in his capacity as a sworn police officer employed by the City of Philadelphia, and the under color of state law.

9.     Defendant **CAPTAIN NASHID AKIL** (hereafter "AKIL") is an adult male individual and citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

10.     At all times material, AKIL acted in his capacity as a sworn police officer employed by the City of Philadelphia, and the under color of state law.

11.     Defendant **LIEUTENANT BRENT CONWAY** (hereafter "CONWAY") is an adult male individual and citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

12.     At all times material, CONWAY acted in his capacity as a sworn police officer employed by the City of Philadelphia, and the under color of state law.

13.     At all times material, Plaintiff was an "employee" of the City within the meaning of all applicable law.

14.     At all times material, the City was and is Plaintiff's "employer" within the meaning of all applicable law.

15.     In this Complaint, all references to "the City" and/or "PPD" are meant to refer interchangeably to Defendant City of Philadelphia.

16.     At all relevant times, the City and PPD acted or failed to act through their agents, servants and employees, each of whom were acting within the course and scope of their employment.

## JURISDICTION & VENUE

17.     This Court has subject matter jurisdiction over Plaintiff's claims arising under Federal law pursuant to 28 U.S.C. §1331.

18.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.     On January 27, 2021, Plaintiff dual-filed with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") a Charge of Discrimination against Defendant CITY OF PHILADELPHIA. (EEOC Charge No. 530-2021-01665).

20.     On November 24, 2021, Plaintiff amended her Charge of Discrimination to include events that occurred after the submission of the initial Charge.

21.     On July 18, 2022, the EEOC issued a Notice of Right to Sue on Plaintiff's Charge of Discrimination against Defendant CITY OF PHILADELPHIA, as amended.

22.     Plaintiff has exhausted her administrative remedies.

## FACTUAL ALLEGATIONS

23.     Plaintiff was hired by the PPD as a Police Officer around April 23, 2007.

24.     Plaintiff was assigned to the 22nd Police District around November 2007 and has worked there since.

25.     Around June 2018, Plaintiff was on duty with her then-partner, Officer Kiana Farlow.

26.     While on patrol, Plaintiff and Officer Farlow responded to a citizen flagging them down.

27.     The complainant explained her grandson was robbed of his bicycle.

28.     While Plaintiff and Officer Farlow were speaking with the complainant, her grandson indicated that the bicycle had been returned.

29.     Thereafter, the complainant declined to pursue pressing charges or filing a police report.

30.     During the encounter and unbeknownst to Plaintiff, Officer Farlow made a radio call for a supervisor to come out to their location.

31.     Sergeant SANTIAGO responded to the call and he engaged in conversation with Officer Farlow when he arrived.

32.     At some point, Plaintiff could hear that SANTIAGO's tone of voice sounded angry and he then left the scene shortly thereafter.

33.     Plaintiff never said a word to SANTIAGO and SANTIAGO never said a word to Plaintiff.

34.     Officer Farlow told Plaintiff that SANTIAGO was angry and had demanded that Officer Farlow come back to the station.

35.     After returning to the station, SANTIAGO called Officer Farlow into an office and closed the door. Plaintiff remained outside of the door.

36.     Almost immediately after closing the door, SANTIAGO began verbally berating Officer Farlow so loudly that everything could be heard through the shut door.

37.     Plaintiff heard SANTIAGO screaming about how Officer Farlow kept cutting him off when he was trying to speak with her.

38.     As the screaming escalated, Plaintiff then heard Officer Farlow begin screaming "Don't touch me! Get your hands out of my face!" with an unmistakable sound of fear.

39.     At all times material, Plaintiff believed Officer Farlow was in danger of imminent physical harm.

40.     Plaintiff immediately reacted by opening the door to the office to come to her partner's aid.

41.     Plaintiff witnessed SANTIAGO standing inches away from Officer Farlow still screaming in her face.

42.     Officer Farlow yelled "you put your hands in my face!"

43.     Still visibly irate, SANTIAGO yelled back, "my hands weren't in your face, I was in your face!" SANTIAGO then stormed out of the office.

44.     Immediately after SANTIAGO left, Officer Farlow broke down and started hysterically crying because of what SANTIAGO had just done to her.

45.     Shortly after the incident, Officer Farlow filed an internal EEO Complaint against SANTIAGO.

46.     Around August 8, 2018, Plaintiff appeared and provided testimony in the internal EEO Complaint proceeding brought by Officer Farlow against SANTIAGO arising from the incident in June 2018.

47.     At all times material, Sergeant CONWAY[1] was the officer responsible for investigating Farlow's EEO Complaint against SANTIAGO.

---

[1] Defendant CONWAY was a Sergeant at the time of the events alleged herein but was subsequently promoted to Lieutenant.

48.     CONWAY began the interview by explaining to Plaintiff that he "knew [SANTIAGO] well" and that he "had a hard time believing" that SANTIAGO had acted in the way Officer Farlow's EEO Complaint alleged.

49.     CONWAY detailed his personal and professional relationship with SANTIAGO and told Plaintiff "SANTIAGO is a good guy" and "I don't believe the allegations" multiple times at the outset of the interview.

50.     CONWAY's statements to Plaintiff about his relationship with SANTIAGO were intended to dissuade Plaintiff from speaking freely about what she had witnessed SANTIAGO do to Officer Farlow.

51.     Plaintiff detailed everything she had witnessed, and signed a written statement prepared by CONWAY.

52.     Approximately three months later, in November 2018, CONWAY informed Plaintiff that he needed her to come back and sign another statement because he had "forgot to print out" the statement Plaintiff signed in August.

53.     Plaintiff complied and signed what she believed was an identical copy of the statement she had reviewed and signed three months before.

54.     Around November 29, 2019, Plaintiff was called to the office of Lieutenant Todd Landherr.

55.     Plaintiff had never been called to Lt. Landherr's office in her entire career and so had no idea why she was being called into his office.

56.     Plaintiff asked what the meeting was about, and Lt. Landherr responded by saying "Oh, she [Officer Farlow] didn't tell you? You're getting 18s for the incident with Farlow."

57.     In the PPD, formal disciplinary action is known colloquially as getting "18s."

58.     Lt. Landherr then presented Plaintiff with a "75-18" – formal written notice of disciplinary action.

59.     The 75-18 notice cited Plaintiff for neglect of duty for not writing a police report for the stolen bicycle incident with Officer Farlow that occurred back near 18 months prior in June 2018.

60.     At all times material prior to November 29, 2019, no one said anything about the failure to write a report or the incident with SANTIAGO and Farlow.

61.     Plaintiff was being disciplined based on her involvement in the incident on June 2018 with Officer Farlow that led to Officer Farlow filing and internal EEO Complaint against SANTIAGO.

62.     Plaintiff stood speechless as she tried to comprehend why she was being disciplined before she noticed that the 75-18 form had been signed by Captain Tyrell McCoy (hereafter "McCoy").

63.     McCoy had been the Captain in command of the 22nd District since early 2019.

64.     In June 2018, McCoy was working as a Lieutenant in the PPD's Internal Affairs Division ("IAD") under the command of then-Captain Robin Wimberly, which was responsible for investigating and resolving internal EEO complaints such as Officer Farlow's complaint against SANTIAGO.

65.     Around late 2018, McCoy was promoted to Captain and was assigned to command the 22nd Police District, where both Plaintiff and SANTIAGO worked.

66.     Shortly after he took command of the 22nd District, it came to light that Captain McCoy was involved in a sexual relationship with SANTIAGO, a subordinate officer under his direct command.

67.     Around the same time that their sexual relationship came to light, a Lieutenant within the 22nd District had submitted a whistleblower complaint to IAD accusing SANTIAGO knowingly allowing Stacey Wallace, an officer under his supervision, to steal 80 hours of time from the PPD.

68.     During the investigation of SANTIAGO, Captain McCoy had been accused of using his influence within IAD, and specifically his close personal relationship with Deputy Commissioner Robin Wimberly who was commanding officer of IAD, to protect SANTIAGO from receiving any form of discipline for what would have been very serious misconduct.

69.     To mitigate the actual and apparent conflicts of interest created by a commanding officer involved in a sexual relationship with a subordinate, SANTIAGO was temporarily detailed to a different district for a few months before McCoy could be permanently reassigned to command a different district.

70.     At the time Officer Farlow brought the June 2018 EEO complaint against SANTIAGO, and at the time he subsequently took command of the 22nd District, McCoy would have had direct knowledge of the complaint and investigation against SANTIAGO because of his position as a Lieutenant in IAD.

71.     Moreover, at the time he took disciplinary action against Plaintiff and Officer Farlow in November 2019, McCoy was set to be reassigned to a different police district less than a week later.

72.     Indeed, McCoy took disciplinary action against Plaintiff and Officer Farlow in retaliation for Officer Farlow's EEO complaint against SANTIAGO and Plaintiff's testimony against SANTIAGO corroborating Farlow's complaint.

73. As Plaintiff began to put the pieces together, Plaintiff grew more suspicious of McCoy's disciplinary action against her because CONYWAY had only asked a few passing questions about whether an incident report was prepared for the stolen bicycle incident with Officer Farlow in June 2018.

74. When Plaintiff reviewed the statement CONWAY had her sign 3 months later because he "forgot to print" some pages, she realized that CONWAY had changed her statement to make it appear that Plaintiff knowingly failed to write a report for the incident in June 2018.

75. CONWAY changed answers and fabricated Plaintiff's responses to questions that were never asked in Plaintiff's August 2018 witness statement.

76. Around December 3, 2019, Plaintiff filed an internal EEO Complaint against CONWAY alleging that Sgt. Conway had a personal relationship with SANTIAGO that created a conflict of interest in his investigation of Officer Farlow's EEO Complaint against SANTIAGO.

77. Specifically, Plaintiff's internal EEO complaint against CONWAY stated the following:

> On the above date and time, I was interviewed in regards to an alleged EEO complaint. The complaint was made against Sgt. Santiago #8617. During the interview Sgt. Conway #8892 continued to express that he did not believe the allegations. Sgt. Conway made me feel very uncomfortable and I felt that he was trying to convince me to change my statement. It was conflict of interest and he should not have been assigned to the case. Sgt. Conway typed up my statement and asked me to sign. I left the interview feeling uneasy. I remember being glad that the interview was over and that I would never have to see him again. That dream was short lived because I did have to go back. I had to sign more papers because Sgt. Conway said that he forgot to print them out. I never questioned his actions until now. On 11/29/19 I received 75-18's for neglect of duty The paperwork stated that I failed to make a report. A report that eventually lead to the EEO complaint being filed. I read my interview statement a couple times to see if I had missed something. After reading it over and over I realized that Sgt. Conway had altered my statement and had me resign the paperwork on 11/28/18. The

> paperwork was now written so that it would show negligence on my behalf. Sgt. Conway had made comments regarding other matters that concern Sgt. Santiago #8617. I was told that P/O Farlow #3858 received 75-18s as well. However, I think she was just reprimanded. P/O Farlow is now a part of the click and I feel that Captain Terrell McCoy looked out for her. He would do anything to protect Sgt. Santiago and his crew. I have witnesses that can confirm to my statement.

78.     Around the end of December 2019, a few weeks after McCoy was reassigned to command a different Police District, and after Plaintiff's EEO complaint against CONWAY, SANTIAGO was assigned back to the 22nd District and became Plaintiff's direct supervisor.

79.     At all times material, SANTIAGO held supervisory authority over Plaintiff with respect to her employment and was authorized by the PPD to take tangible employment action against police officers in the 22nd District, including Plaintiff.

80.     In early January 2020, a few weeks after McCoy left the 22nd District and SANTIAGO returned to become Plaintiff's direct supervisor, Plaintiff received notice that her assignment was being changed from working inside the Operations Room to working the street on patrol.

81.     Plaintiff has worked "inside" for the majority of her 14 years in the 22nd Police District and had been working inside continuously for more than five years before SANTIAGO changed her assignment without any discussion or advance notice of the change.

82.     At all times material, it was and is common knowledge within the PPD that a unilateral change in assignment without any incipient event or discussion is the first warning that an officer has a problem with their supervisor. Such an action by a supervisor serves no purpose other than a display of power to remind the subordinate officer who's boss.

83.     Plaintiff immediately knew that SANTIAGO's actions in changing her assignment were directly related to Plaintiff's participation in Farlow's EEO complaint against SANTIAGO,

11

and Plaintiff's subsequent derivative EEO complaint against CONWAY based on his conflict of interest in investigating SANTIAGO.

84.     Moreover, only weeks earlier, SANTIAGO's lover and commanding officer, Captain McCoy, had used his last days as Captain in command of the 22nd District to take disciplinary action against Plaintiff for her tangential involvement in a minor incident nearly two years prior that was significant only for the fact that it resulted in Officer Farlow filing an EEO complaint against SANTIAGO.

85.     Following SANTIAGO assuming the position as Plaintiff's direct supervisor and unilaterally changing her assignment for no reason, SANTIAGO began a campaign of harassment and retaliation against Plaintiff.

86.     Around January 31, 2020, SANTIAGO approached Plaintiff while on duty and presented her with the assignment sheet, and a subpoena for Plaintiff to appear before the Police Board of Inquiry ("PBI").

87.     As SANTIAGO handed the documents to Plaintiff, he pointed to the subpoena and asked Plaintiff what it was about.

88.     Plaintiff responded by informing SANTIAGO that she was fighting the 75-18s that were issued to her as a result of the incident that took place with her and Officer Farlow back in June 2018.

89.     At all times material, SANTIAGO had knowledge that the disciplinary action was directly related to the incident that had led to Officer Farlow filing an EEO complaint against SANTIAGO.

90.     Feigning surprise, SANTIAGO told Plaintiff that he wrote a letter on behalf of Officer Farlow to the PBI to ensure that Officer Farlow didn't receive discipline.

91.     SANTIAGO then stated to Plaintiff that he would have written a letter on her behalf as well if he had known Plaintiff was issued discipline as a result of the June 2018 incident involving Officer Farlow.

92.     At all times material, SANTIAGO's actions were intended to dissuade Plaintiff from pursuing a Complaint against him.

93.     Around February 6, 2020, Plaintiff appeared at a hearing before the Police Board of Inquiry ("PBI") to challenge the disciplinary action taken against her for failing to write a report of the stolen bicycle incident 18 months prior in June 2018.

94.     Both SANTIAGO and CONWAY were present at the PBI hearing.

95.     At the PBI hearing, Plaintiff put on record that she believed the discipline was part of an effort by SANTIAGO and CONWAY to retaliate against her for her participation in Officer Farlow's EEO Complaint against SANTIAGO.

96.     Plaintiff testified that CONWAY had changed her written statement about the incident with Farlow and SANTIAGO to protect SANTIAGO and to undermine Officer Farlow's EEO Complaint against SANTIAGO.

97.     It is PPD procedure to audio record every PBI hearing and upon information and belief, there exists a recording of Plaintiff's February 6, 2020 PBI hearing.

98.     After the PBI hearing, Plaintiff opened the door the leave the room when she was confronted by SANTIAGO and CONWAY who had been standing directly outside the doorway listening to Plaintiff's testimony in the hearing.

99.     Despite reporting CONWAY and SANTIAGO's misconduct and conflicts of interest, Plaintiff was disciplined with a one-day unpaid suspension that was to be served on Friday, April 3, 2020.

100. The day of Plaintiff's suspension happened to be one of Plaintiff's scheduled days off and Plaintiff was thus unable to serve her suspension on April 3, 2020.

101. Coincidentally, that Friday also was then end of a pay period in which Plaintiff had worked a full 80 hours.

102. When Plaintiff got her paycheck, however, she discovered that someone had gone into the system and docked her 8 hours for that pay period with the cited reason being a suspension. As a result, Plaintiff was only paid for 72 hours when she in fact worked 80 hours during that pay period.

103. Such a change in payroll does not happen automatically; meaning someone would have had to go into the PPD payroll system and make that change.

104. Plaintiff immediately reported the error and brought a union grievance to obtain the additional pay she was owed, but the PPD refused to rectify their error.

105. To date, the PPD has refused to pay Plaintiff the 8 hours she's owed notwithstanding a union grievance, and no one has attempted to reschedule her 1-day suspension.

106. Around April 30, 2020, SANTIAGO approached Plaintiff and motioned as though he was handing Plaintiff the assignment sheet.

107. As Plaintiff went to grab the sheet, SANTIAGO stopped and stared directly into Plaintiff's eyes with a piercing stare before opening his hand and dropping the assignment sheet on the floor.

108. SANTIAGO glared at Plaintiff a few seconds longer before turning his back to Plaintiff and walked away without saying a word.

109. Thereafter, Plaintiff noticed that SANTIAGO was staring at her and had his fists balled up as though he was ready to physically attack Plaintiff.

110.    When she made eye contact, SANTIAGO made a quick lunging motion towards Plaintiff as though he was trying to physically intimidate her.

111.    Around May 2, 2020, Plaintiff was standing in the Operations Room talking to Officer Joseph Sulpizio and Civilian-employee Doris Myers.

112.    While Plaintiff was engaged in conversation, SANTIAGO walked past her and intentionally bumped into Plaintiff with his thigh in "hip check" type motion.

113.     As Plaintiff turned around, SANTIAGO took one step back before aggressively lunging towards Plaintiff with his fists balled up in an effort to make Plaintiff flinch.

114.    Officers Suplizio and Myers both witnessed SANTIAGO lunge at Plaintiff.

115.    Around May 13, 2020, Plaintiff was on duty and in the police station performing administrative work.

116.    At one point, Plaintiff was standing in front of a desk searching for property receipts she needed to complete reports.

117.    As she was looking through the files, Plaintiff felt a strong blow to her upper right back that knocked her off balance and sent a sharp pain radiating down the side of her body.

118.    When Plaintiff turned to see what had happened, SANTIAGO was standing directly behind her glaring with his hands balled into fists as though he was ready to swing again.

119.    After processing what had just happened and realizing SANTIAGO just assaulted her, Plaintiff yelled at SANTIAGO "keep your hands to yourself!"

120.    SANTIAGO angrily snapped at Plaintiff that she "should not have been in his way."

121.    Plaintiff then ran back to her desk to get away from SANTIAGO and to process what had just happened.

122.   Multiple ORA staff including Officers Stacey Wallace, Karen Wilson, and Jonathan Edmunds, were present in the vicinity at the time SANTIAGO physically assaulted Plaintiff on May 13, 2020.

123.   Around May 18, 2020, Plaintiff came into work on her day off to file an internal EEO Complaint against SANTIAGO arising from SANTIAGO's physical assault against Plaintiff just days earlier.

124.   After Plaintiff's May 18, 2020, EEO Complaint, SANTIAGO remained Plaintiff's immediate supervisor in the 22nd District.

125.   Around May 22, 2020, SANTIAGO walked into the operations room and engaged in conversation with Corporal Teresa Brooks and Sgt. Donna Grebloski.

126.   During the briefing, Plaintiff interjected to state directly to Cpl. Brooks and Sgt. Grebloski that she was uncomfortable with SANTIAGO being around her and that SANTIAGO had been instructed not to have contact with Plaintiff.

127.   Cpl. Brooks assured Plaintiff that nothing would happen while she was working and then told SANTIAGO that it would be a good idea if he went into the Sergeants room and finished the sheet.

128.   Later in the day on May 22, 2020, Captain Nashid AKIL called Plaintiff into his office where Lieutenant Todd Landherr and Cpl. Brooks were present.

129.   Captain AKIL then sternly told Plaintiff that, "I know that you have an issue with SANTIAGO, but I will not tolerate subordination."

130.   Captain AKIL's admonition was clearly in reference to Plaintiff's statements earlier that day about how she did not feel comfortable being around SANTIAGO.

131.   Fearing she would invite further retaliation if she continued to challenge

SANTIAGO, Plaintiff assured Capt. AKIL that she would not cause any issues and that she just wanted SANTIAGO to stay away from her.

132.   At no time did Capt. AKIL ask Plaintiff for her version of events or her complaint against SANTIAGO.

133.   At no time did Captain AKIL even acknowledge that Plaintiff had filed an EEO Complaint against SANTIAGO alleging that she had been physically assaulted by her supervisor in the workplace.

134.   Around May 22, 2020, Plaintiff filed a criminal incident report against SANTIAGO arising from the assault on May 13, 2020.

135.   Plaintiff's May 22, 2020 criminal incident report was assigned DC# 20-22-086321.

136.   Around May 22, 2020, Plaintiff received a subpoena to appear for an Internal Affairs Board ("IAB") hearing on May 26, 2020 to give testimony regarding her internal EEO complaint and criminal complaint against SANTIAGO arising from the May 13, 2020 assault.

137.   Plaintiff appeared at the IAB hearing and was greeted by Lt. Cynthia Frye who was conducting the hearing and Sgt. Zachary Koenig, who was present as a witness.

138.   Thereafter, Lt. Frye questioned Plaintiff about her complaints against SANTIAGO and CONWAY, and Plaintiff explained in detail all of SANTIAGO and CONWAY's unlawful conduct against her and other PPD officers who had brought complaints against SANTIAGO.

139.   After she finished questioning Plaintiff, Lt. Frye handed a draft of Plaintiff's typed statement to Sgt. Koenig and told him to take the statement to an unnamed "Inspector" to let him review it.

140.   Lt. Frye said that the Inspector is "really tedious" and "likes for things to be on

point."

141.    Sgt. Koenig returned about 15 minutes later with a list of questions that he said the "Inspector" wanted to be added and clarified.

142.    Sgt. Koenig stated that the Inspector wanted to know if Plaintiff had been pushed by SANTIAGO.

143.    Sgt. Koenig's questions from the "Inspector" about whether Plaintiff had been pushed were directly intended to undermine Plaintiff's complaint of assault and to protect SANTIAGO.

144.    Plaintiff stated adamantly that she was punched, not pushed, and that she had never said anything about being pushed in her EEO Complaint or in the interview.

145.    Sgt. Koenig handed Lt. Frye Plaintiff's written EEO complaint and told her to read it and see if it mentioned anything about being pushed.

146.    Lt. Frye acknowledged that there was nothing in the Complaint about being pushed and stated that she would not mention it in Plaintiff's statement.

147.    A copy of Plaintiff's signed statement from the May 26, 2020 IAB hearing is attached as Exhibit A and incorporated by reference as if fully set forth herein.

148.    Plaintiff asked Lt. Frye if her two complaints would be investigated separately.

149.    Lt. Frye told Plaintiff she said that she "wasn't really sure" but then said that this incident was no longer an EEO matter and was now considered a criminal incident.

150.    Feeling that her complaints had fallen on deaf ears and fearing for her own safety at work, around May 27, 2020, Plaintiff approached Lt. Stephen Haraszkiewicz and Sgt. Phillip Cherry to confide in them that the situation with SANTIAGO was causing her significant emotional distress and impacting her ability to do her job.

151.    Plaintiff explained that she did not feel safe being around SANTIAGO and felt her safety was not a priority for the supervisors in the 22nd District.

152.    Plaintiff expressed further that she felt SANTIAGO was being protected by CONWAY and other higher-ranking members of the PPD because multiple other officers had made similar complaints against SANTIAGO, but no action or discipline was ever taken against him.

153.    Plaintiff explained that Captain AKIL had made it a point to reprimand her for insubordination simply because she had openly expressed that she didn't feel comfortable being around SANTIAGO barely a week after he physically assaulted her.

154.    Sgt. Cherry explained that he did not want to get involved because he liked SANTIAGO and he was not going to let Plaintiff's situation interfere with that.

155.    Lt. Haraszkiewicz's reaction made clear he didn't want to get involved.

156.    Overcome by the realization that she had no one to turn to for help, Plaintiff asked Lt. Haraszkiewicz to provide her with the contact information for EAP so she could get counseling.

157.    To date, there has been no substantive action by the City or the PPD to investigate or resolve Plaintiff's EEO Complaints against SANTIAGO and CONWAY.

158.    To date, there has been no substantive action by the City or the PPD to investigate Plaintiff's criminal complaint arising from SANTIAGO's May 13, 2020 criminal assault of Plaintiff.

159.    Defendant has taken action to investigate other EEO complaints during the same time frame that Plaintiff's has languished without any action or resolution.

160.    The above are just some of the examples of unlawful harassment and retaliation to which SANTIAGO and CONWAY subjected the Plaintiff because of her participation in Officer Farlow's EEO Complaint as a witness against SANTIAGO, and Plaintiff's opposition SANTIAGO and CONWAY's unlawful employment practices.

161.    Plaintiff claims that some or all of the harassing and retaliatory conduct set forth in this Charge was intended to dissuade Plaintiff from pursuing her complaints against SANTIAGO and CONWAY.

162.    Plaintiff claims a continuous practice of harassment and retaliation and all claims herein under the continuing violations doctrine.

163.    At all times material, Plaintiff acted under a reasonable, good-faith belief that SANITAGO and CONWAY's actions violated Plaintiff's legally protected right to be free from harassment and retaliation in the workplace.

164.    At all times material, Plaintiff opposed the harassing and retaliatory conduct set forth in this Charge and made good-faith efforts to take corrective action the through the channels available to her as an employee of the City of Philadelphia/PPD.

165.    At all times material, Plaintiff endured the harassing and retaliatory conduct set forth in this Charge as conditions of her continued employment with the City and PPD.

166.    At all times material, the conduct of SANTIAGO and CONWAY set forth in this charge created a hostile work environment in which Plaintiff was subjected to severe, pervasive and unreasonable verbal abuse, physical assault, and disciplinary action because of Plaintiff's participation in Officer Farlow's EEO Complaint against SANTIAGO, and Plaintiff's opposition to SANTIAGO and CONWAY's unlawful employment practices.

167.    At all times material, Defendant knew or should have known that SANTIAGO and CONWAY's harassing and retaliatory conduct towards Plaintiff was unlawful, and Defendant failed to take prompt remedial action to prevent further harassment and retaliation against Plaintiff.

168.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other nonpecuniary losses. Plaintiff has further experienced severe emotional and physical distress and aggravation, activation, and/or exacerbation of any preexisting condition.

169.    Plaintiff further claims constructive and/or actual discharge to the extent Plaintiff is terminated from Plaintiff's position as a result of the unlawful discrimination and retaliation.

170.    In the event Defendant claims or a Court determines that Plaintiff is an Independent Contractor, Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendant owed and breach its duty to Plaintiff to prevent the harassment/discrimination/retaliation and is liable therefore for negligence.

### JANUARY – MARCH 2021

171.    Around January 27, 2021, Plaintiff filed her first Charge of Discrimination against Defendant (hereafter "January 2021 Charge").

172.    Plaintiff's January 2021 Charge alleged, retaliation and retaliatory hostile work environment.

173.    Plaintiff's January 2021 Charge alleged, among other things, that she was physically assaulted by SANTIAGO in retaliation for Plaintiff's participation as a witness in an EEO Complaint against SANTIAGO brought by another officer.

174.     Plaintiff filed both an internal EEO Complaint and a criminal complaint immediately after she was assaulted by SANTIAGO.

175.     Plaintiff's January 2021 Charge alleged, among other things, that shortly after Plaintiff was assaulted by SANTIAGO, she was subjected to retaliation by the Captain and Commanding Officer of Plaintiff's District, Defendant AKIL.

176.     Plaintiff's January 2021 Charge also alleged multiple acts of retaliation by supervisory officers in the 22nd District.

177.     Around February 4, 2021, Plaintiff received a phone call from Corporal Theresa Brooks (hereafter "Cpl. Brooks") who proceeded to tell Plaintiff that Sergeant Donna Grebloski called her and told Cpl. Brooks that the City Solicitor had notified Sgt. Grebloski that she was identified in Plaintiff's January 2021 Charge.

178.     Cpl. Brooks also informed Plaintiff that the City Solicitor had emailed a copy of Plaintiff's January 2021 Charge to all individuals named in the Charge, including Sgt. Grebloski.

179.     Around February 4, 2021, CAPT. AKIL was notified of Plaintiff's January 2021 Charge and provided a copy of the Charge itself.

180.     Around February 4, 2021, Lieutenant Todd Landherr (hereafter "Lt. Landherr") was notified of Plaintiff's January 2021 Charge and provided a copy of the Charge itself.

181.     Plaintiff subsequently learned that her January 2021 Charge was freely shared with numerous people in the PPD that had absolutely nothing to do with the events set forth in the Charge.

182.     After Plaintiff learned that nearly everyone in the 22nd District was aware of her January 2021 Charge, the retaliation and harassment worsened significantly.

183.     Plaintiff also learned that other officers were not properly coding and entering information necessary for Plaintiff to complete her paperwork.

184.     These efforts to sabotage were intentional, and only directed to Plaintiff in an attempt to make it appear that Plaintiff was not properly doing her job.

185.     Sgt. Wilson, Cpl. Ocasio, and OFC. WHITE engaged in similar retaliatory behavior all the way back in August 2019 after learning that Plaintiff became involved as a witness in the EEO Complaint of another officer against SGT. SANTIAGO.

186.     Back around September 24, 2019, Lt. Landherr had sent out an email to Sergeant Dana Bradley in the Operations Room explaining that it "had come to his attention" that Plaintiff was improperly handling paperwork in the Operations Room the previous day and ordering that Plaintiff be assigned to street patrol until further notice.

187.     Sgt. Bradley responded by explaining to Lt. Landherr that Plaintiff was at the firing range for training on the date in question.

188.     Around March 4, 2021, Plaintiff learned that Sergeant Debbie Wilson (hereafter "Sgt. Wilson"), Corporal Lissette Ocasio (hereafter "Cpl. Ocasio"), and Officer Jamie Leigh White (hereafter "OFC. WHITE") had been spreading rumors among other officers in the 22nd District Operations Room that Plaintiff that was intentionally throwing other officers' paperwork in the trash.

189.     That Plaintiff had been accused of mishandling paperwork when she was not even working in the Operations Room made clear that the rumors were being spread about her maliciously and in retaliation for her EEO activity.

190.     On March 5, 2021, upon realizing that the same retaliatory behavior was happening again, Plaintiff sent an email to multiple supervisors in the 22nd District including, Lt. Landherr,

Lieutenant Stephen Haraszkiewicz, Cpl. Ocasio, Cpl. Brooks, and OFC. WHITE notifying them

of the situation and specifically notifying them that she was being harassed and that she wanted

the harassment to stop.

191.   Specifically, Plaintiff's March 5, 2021 email stated:

> I am writing to inform you about an incident that took place on 03/04/21. During
> the 2x10 tour of duty, (11) 75-48s and (1) 75-48D was intentionally placed in the 1
> squad box. I was under the impression that this is a 24 hour operation and that we
> were all work together to get the job done. The 1 squad officers are afraid to leave
> their paperwork after I am gone for the day. Some have expressed that the 2 squad
> ORAs are not entering their paperwork and fear that it will be thrown in the trash.
> This is not the first time that I have had issues with 2 squad regarding work. This
> was a deliberate act and I need the harassment to stop. They are deliberately doing
> things to make it look as if I am not doing my job. I am the hardest working ORA
> that you have on staff at the 22nd district and I need the harassment to stop. The
> issue was addressed with Corporal Ocasio and she shrugged it off like it was not a
> big deal. All incidents regarding the 2 squad ORAs are documented. Thank you in
> advance for any assistance regarding this matter.

192.   At all times material, PPD Directive 8.7, entitled "EMPLOYMENT

DISCRIMINATION/ EQUAL EMPLOYMENT OPPORTUNITY (EEO)", required Supervisors,

such as Lt. Landherr and Lt. Haraszkiewicz, to report any complaints of harassment brought to

their attention:

> Supervisors shall initiate a complaint/report to the EEO Officer, anytime they
> believe an employee, regardless of assignment, is experiencing or possibly
> experiencing any form of employment discrimination, harassment or retaliation
> from any member of the department, regardless of rank or assignment. The same
> procedure will be used to file the complaint as referenced above in Section 1(d).
>
> > NOTE: Employment discrimination is a violation of both federal and state
> > law. Therefore, supervisors shall submit an EEO complaint/report,
> > regardless of whether the employee desires to officially file a complaint.

193.   At all times material, PPD Directive 8.7 required Supervisors, such as Lt. Landherr

and Lt. Haraszkiewicz, to take action to stop harassing conduct:

A. Supervisors have a legal responsibility to ensure that their areas of supervision are free from employment discrimination, harassment and retaliation and a to safeguard their subordinates from such prohibited conduct. Therefore, supervisors shall be held to a higher standard when facing discipline and/or demotion as a result of any violation of this directive and/or failure to take necessary actions to address such prohibited conduct.

B. Supervisors are not only accountable for themselves with respect to this Directive, but also for the prohibited conduct of their subordinates, other supervisors and non-employees present in the workplace and during any work related party, gathering or other event where they know, or SHOULD HAVE KNOWN, prohibited conduct was occurring.

194.    At all times material, Lt. Haraszkiewicz was Plaintiff's immediate supervisor, and Lt. Landherr was the immediate supervisor of Sgt. Wilson, Cpl. Ocasio, and Ofc. White.

195.    Following Plaintiff's March 5, 2021 email to Lt. Landherr and Lt. Haraszkiewicz informing them of harassing conduct, Lt. Landherr and Lt. Haraszkiewicz took no action whatsoever.

196.    In fact, Lt. Landherr and Lt. Haraszkiewicz never acknowledged that they. even received the email.

197.    The retaliation and harassment continued.

198.    On March 25, 2021, Officer Tynisha Smith (hereafter "Ofc. Smith") started an argument with Plaintiff when she attempted to correct Ofc. Smith's improper handling of a domestic violence complaint.

199.    As Ofc. Smith became increasingly irate, she began yelling at Plaintiff that "they" are scared of Plaintiff, but Ofc. Smith wasn't scared of Plaintiff like everyone else.

200.    Ofc. Smith continued yelling at Plaintiff that she did not need this job, and she was not going to "play" with Plaintiff like everyone else.

201.    Plaintiff asked Ofc. Smith who she meant by "they," and specifically asked Ofc. Smith if she was referring to Plaintiff's EEO complaints and whistleblowing activity.

202.    Ofc. Smith then angrily yelled "all you are going to do is run and report it."

203.    Ofc. Smith's statement confirmed that she was referring to Plaintiff's EEO activity and her January 2021 Charge.

204.    Ofc. Smith was and is close friends with many of the individuals that Plaintiff had raised EEO complaints about and had identified in her January 2021 Charge.

205.    In particular, Ofc. Smith was and is close friends with SGT. SANTIAGO, and SGT. SANTIAGO had previously been Ofc. Smith's supervisor.

206.    At all times material, Plaintiff had never discussed her January 2021 Charge, or any of her EEO activity directly with Ofc. Smith.

207.    Ofc. Smith's verbal altercation with Plaintiff took place in front of Sergeant Barry Sudler (hereafter "Sgt. Sudler").

208.    At some point during the verbal altercation, Sgt. Sudler ordered Plaintiff and Ofc. Smith to stop arguing.

209.    Plaintiff immediately complied and stopped talking to Ofc. Smith.

210.    Ofc. Smith continued yelling at Plaintiff and Sgt. Sudler had to physically restrain Ofc. Smith in order to diffuse the situation.

211.    Sgt. Sudler ordered Ofc. Smith to leave the room and go upstairs to the camera room.

212.    After Ofc. Smith left the room, Plaintiff asked Sgt. Sudler if he knew why Ofc. Smith was so upset with her.

213.    Sgt. Sudler told Plaintiff to step into the hallway to speak with him because he wasn't going to talk about it in front of everyone else in the room.

214.    Sgt. Sudler asked Plaintiff if this was an ongoing problem with Ofc. Smith.

215.    Plaintiff explained that she had never had any problems with Ofc. Smith and that Ofc. Smith's behavior changed after Plaintiff had filed her January 2021 Charge.

216.    Plaintiff told Sgt. Sudler that Ofc. Smith's comments were clearly because of her January 2021 Charge and her whistleblowing activities.

217.    When Plaintiff mentioned her EEO complaints and whistleblowing activities, Sgt. Sudler immediately tried to change the subject and stated that he did not want to get involved in other people's business.

218.    Plaintiff told Sgt. Sudler that there would not be any further problems with Ofc. Smith and that she could remain professional on the days that they worked together.

219.    Plaintiff told Sgt. Sudler that she believed Ofc. Smith's action were retaliatory and that she was going to notify her attorney about what happened.

220.    Sgt. Sudler said nothing further, and the conversation was over.

221.    At all times material, Sgt. Sudler never stated or implied in any way that Plaintiff had refused to obey any of Sgt. Sudler's orders.

222.    At all times material, Sgt. Sudler never indicated to Plaintiff that the incident with SMITH would result in disciplinary action.

223.    On March 29, 2021, a few days after the incident with Ofc. Smith, Sergeant John Madara (hereafter "Sgt. Madara") pulled Plaintiff into the hallway to inform her that CAPT. AKIL had ordered Plaintiff to be reassigned from working inside in the Operations Room, to working street patrol starting immediately.

224.    At all times material, Plaintiff had been assigned to working "inside" for the majority of her 15-year career with the PPD.

225.    As alleged in her January 2021 Charge, the last time Plaintiff was reassigned to street patrol was a retaliatory reassignment in January 2020.

226.    During the same conversation, Sgt. Madara warned Plaintiff that CAPT. AKIL had stated that he was going to have Plaintiff investigated based on the incident with Ofc. Smith.

227.    Fearing that the incident with Ofc. Smith would be used as a basis for further harassment and retaliation, on March 29, 2021, Plaintiff submitted an internal Misconduct Complaint documenting her version of events to protect herself.

228.    On March 30, 2021, Plaintiff was attending previously scheduled training held in at the Police Academy.

229.    While Plaintiff was at the Police Academy, she went to the computer room and asked the officer inside if she could use a computer.

230.    The officer asked if everything was okay, and Plaintiff informed him that she needed to file an EEO complaint.

231.    The officer directed her to a computer and Plaintiff submitted an EEO Complaint against CAPT. AKIL based on his retaliatory actions to change Plaintiff's duty assignment and threats to have Plaintiff investigated. Specifically, Plaintiff's March 30, 2021, EEO Complaint stated:

> Akil has participated in several incidents of retaliatory behavior towards me since May of 2020. Akil has direct knowledge of the harassing and retaliatory behavior that I have been subjected to. Akil is really good friends with Debbie Wilson and all of the individuals that harassed and retaliated against me. Debbie Wilson is one of the first supervisors to start this behavior towards me. I have notified all of the 1 squad supervisors about the continuous harassing and retaliatory behavior via verbal conversation or email. Lt. Haraszkiewicz was also notified and has done nothing to assist me with these issues. On 03-29-21, Akil notified Sergeant Madara that he wanted me to be reassigned to work the street. This is not the first time that Akil has done this to me. On 03/25/21, there was incident that involved myself and P/O Smith #2097. Smith was verbally combative and started making inappropriate

28

comments about me engaging in whistle - blower activities. Smith was so irate that Sergeant Sudler had to physically restrain her and repeatedly asked her to stop. Akil made a conscious decision to have this manner investigated along with the decision to change my regular assignment. Akil's behavior is towards me is a direct result of the fact that his name was mentioned in my EEOC complaint. Sergeant Cherry was playing with a gun in the operations room and accused of being mentally unstable, Sergeant Madara and Cherry was accused of sliding cops for hours, Lt. Haraszkiewicz was quarreling on duty with Lt. Mirabella and none of these incidents were investigated by Akil or IAD. In fact, there are multiple incidents that took place at the 22nd district that Akil failed to investigate. The 22nd district is out of control and he is definitely apart of the problem. Akil is pulling strings behind the scenes and I want him and his friends to stop harassing me. Thanks in advance for your consideration of this matter.

232.    While Plaintiff was on the computer typing the above EEO Complaint, two command-level officers at the Police Academy came in to check on Plaintiff and both asked her whether she was making an EEO complaint about any of the officers under their command at the Police Academy.

233.    Plaintiff assured both that their staff were not involved and stated that she just needed to use the computer.

234.    Both commanders then conspicuously made sure to look at Plaintiff's badge and name tag before leaving the room.

235.    At all times material, it was and is a common practice in the PPD for Supervisory and Command level officers to call the Captain of a district and notify them about an EEO complaint being filed by or against officers in their district.

236.    On March 31, 2021, Cpl. Brooks called Plaintiff to tell her that Sgt. Madara told Cpl. Brooks that CAPT. AKIL pulled Sgt. Madara into his office around 3:00pm the same day Plaintiff submitted an EEO Complaint against CAPT. AKIL.

237.    Sgt. Madara told Cpl. Brooks that CAPT. AKIL was upset and wanted to know why Plaintiff was scheduled for training after CAPT. AKIL had ordered her reassigned to work the street.

238.    Sgt. Madara told Cpl. Brooks that CAPT. AKIL asked him if someone was trying to protect Plaintiff by assigning her to training the day after CAPT. AKIL had reassigned her to work street patrol.

239.    Cpl. Brooks said that Sgt. Madara told CAPT. AKIL that Plaintiff had been assigned to training before the incident with Ofc. Smith and before CAPT. AKIL had switched Plaintiff's duty assignment to street patrol.

240.    Sgt. Madara told Cpl. Brooks that CAPT. AKIL then became frustrated and angrily stated: "WELL, I WANT HER ON THE STREET. [PLAINTIFF] IS NOT ALLOWED TO WORK INSIDE."

241.    Starting March 31, 2021, and continuing presently, Plaintiff has worked on street patrol as ordered by CAPT. AKIL.

### APRIL – JUNE 2021

242.    On April 9, 2021, Plaintiff received an email from Lieutenant Ray Saggese of the Internal Affairs Division (IAD) notifying Plaintiff that her March 29, 2021, Misconduct Complaint regarding the incident with Ofc. Smith was reviewed and it was determined the Complaint did not warrant any further investigation by IAD.

243.    Lt. Saggese's email explained that her March 29, 2021, email had been forwarded to CAPT. AKIL.

244.    Around April 10, 2021, Sgt. Madara contacted Plaintiff to ask her to come work inside that day because multiple officers assigned to the Operations Room had called out.

245.   Plaintiff asked Sgt. Madara if CAPT. AKIL was ok with her working inside because she did not want to be disciplined by CAPT. AKIL for working inside.

246.   Sgt. Madara assured Plaintiff he would deal with CAPT. AKIL if he said anything about it.

247.   Plaintiff complied and reported to the Operations Room as instructed by Sgt. Madara.

248.   Shortly after arriving, Sgt. Madara told Plaintiff that CAPT. AKIL had called him and berated him upon learning Plaintiff was working inside.

249.   Sgt. Madara explained that CAPT. AKIL ordered him to send Plaintiff out on street patrol.

250.   Sgt. Madara told Plaintiff that she had to suit up and go back out on street patrol even though the Operations Room would be severely understaffed.

251.   Around April 13, 2021, Plaintiff was working on street patrol when radio dispatch assigned her to "Special Beat 3" to provide additional police presence in a certain area during a shift change.

252.   Plaintiff was assigned to Special Beat 3 because she was already in the area, and she was the closest officer.

253.   At the same time, radio dispatch assigned another officer to work Special Beat 2, which was all the way on the other side of the 22nd District.

254.   Once Plaintiff reported over the radio that she was at Special Beat 3, CAPT. AKIL came over the radio and ordered Plaintiff to switch to Special Beat 2 and the other officer to report to Special Beat 3.

255.    CAPT. AKIL's order required Plaintiff and the other officer to drive all the way across the 22nd District, thereby leaving their respective areas without the police presence that was the whole point of the Special Beat assignments in the first place.

256.    Not only was CAPT. AKIL's ordering Plaintiff to switch Special Beats highly impractical, but it was also highly unusual for a Captain to directly issue orders over the radio when there were multiple Lieutenants and Sergeants on duty for that exact purpose.

257.    CAPT. AKIL's action clearly targeted Plaintiff and served no purpose other than a display of power to remind Plaintiff who is in charge and that CAPT. AKIL was watching Plaintiff.

258.    Around April 23, 2021, Plaintiff was interviewed as part of an IAD investigation regarding incidents Plaintiff had raised in her March 30, 2021 EEO Complaint against CAPT. AKIL.

259.    Specifically, Plaintiff was interviewed regarding several incidents involving 22nd District Supervisors that were not investigated by CAPT. AKIL.

260.    Plaintiff had reported that Sergeant Phillip Cherry (hereafter "Sgt. Cherry") was playing with a firearm in the Operations Room on multiple occasions.

261.    At all times material, officers were not allowed to handle firearms in the Operations Room and protocol required any officer that needed to service their firearm to go into a dedicated room away from other people.

262.    Plaintiff had reported that multiple instances of supervisors in the 22nd District, including Sgt. Madara, that had been accused of "sliding" certain police officers so that they were paid for hours they did not work.

263.    Similarly, Plaintiff reported an incident of quarreling while on duty between Lt. Haraszkiewicz and Lt. Mirabella that culminated in Lt. Mirabella physically dragging a large filing

cabinet with confidential information out into a parking lot that was accessible to the public to block Lt. Haraszkiewicz's parking spot.

264.    Plaintiff testified that CAPT. AKIL knew of should have known about all of these incidents and did not take any action to investigate or discipline the responsible parties.

265.    In contrast, CAPT. AKIL had reassigned Plaintiff and vowed to open a formal disciplinary investigation against her based on nothing more than a one-time verbal altercation between Plaintiff and another officer.

266.    Plaintiff ended her April 23, 2021 IAD interview by testifying:

> I originally wrote the letters as a way to get us help in the 22nd District. I have been assigned to the 22nd District for my entire career and to see how chaotic and out of control the officers and supervisors are is disturbing. The 22nd District is out of control and Captain Akil is a huge part of the problem because he looks the other way instead of restoring order. I did not feel that I could address those issues with the captain or any of the other supervisors because of fear of retaliation.

267.    Around May 1, 2021, Plaintiff was on break inside the Operations Room of the 22nd District headquarters when she overheard another officer explaining that there was an individual in the lobby inquiring about a Protection From Abuse (PFA) Order against him.

268.    Plaintiff informed the officer that the individual was the suspect in a PFA violation report that Plaintiff and rookie Police Officer Joseph Lane had responded to earlier that day.

269.    Plaintiff notified Cpl. Brooks that the there was an individual in the lobby who had assaulted his girlfriend in violation of a PFA.

270.    Cpl. Brooks called for Officer Lane to report to headquarters so he could be involved in making an arrest in the PFA violation that he and Plaintiff had handled earlier that day.

271.    Because Plaintiff was on break, and because she was assigned to street patrol, detaining the suspect was technically the responsibility of the officers assigned to headquarters.

272.   However, the officers at headquarters did not take immediate action to arrest the individual, so Plaintiff went to confront the suspect in the lobby when her break was over because she did not want to risk the individual leaving.

273.   The individual admitted to violating the PFA, and Plaintiff then placed him under arrest without incident.

274.   After arresting the individual, Plaintiff called the detectives on the case to find out how they wanted to proceed.

275.   Plaintiff informed Cpl. Brooks that the detectives wanted the individual booked on the PFA violation, and Cpl. Brooks called the "wagon crew" to come transport the individual to the detectives' division.

276.   Officers Eugene Donahue (hereafter "OFC. DONAHUE") and Brandon Reyes (hereafter "OFC. REYES") arrived to transport the suspect to the detectives' division.

277.   OFC. DONAHUE and OFC. REYES were notably irritated when they spoke with Plaintiff about transporting the individual to the detectives' division.

278.   Before they left, Plaintiff saw OFC. DONAHUE and OFC. REYES speaking with Officer Lane outside in the parking lot.

279.   The next day, May 2, 2021, Cpl. Brooks called Plaintiff to tell her that the same individual Plaintiff had arrested the day before returned to the 22nd District headquarters because he wanted to make a complaint against police.

280.   Cpl. Brooks told Plaintiff that the individual wanted to make a complaint not against her, but against the two male officers [OFC. DONAHUE and OFC. REYES] that had transported him after Plaintiff placed him under arrest.

281.    The individual explained to Cpl. Brooks that he had no problem with Plaintiff because she was just doing her job and he understood that Plaintiff had arrested him because of the PFA and what his girlfriend had told police.

282.    Cpl. Brooks told Plaintiff that stated he wanted to file a complaint against the two officers because "they talked about [Plaintiff] like a dog."

283.    The individual proceeded to tell Cpl. Brooks that while he was being transported after being arrested by Plaintiff, OFC. DONAHUE and OFC. REYES began openly disparaging Plaintiff.

284.    The individual told Cpl. Brooks that OFC. DONAHUE and OFC. REYES stated, specifically about Plaintiff: **"We hate her, nobody likes her, she shouldn't have locked you up, she doesn't know how to do her job and she shouldn't even be on this job."**

285.    The individual told Cpl. Brooks that "if they treated [Plaintiff] that way, then I don't stand a chance."

286.    This entire conversation between Cpl. Brooks and the individual was recorded on Cpl. Brooks' body camera.

287.    This individual – who had just been arrested by Plaintiff the day before – came back to the police station the next day, not because he was upset about being arrested, but because he was so concerned about the disparaging comments that OFC. DONAHUE and OFC. REYES had made to him about Plaintiff.

288.    Cpl. Brooks told Plaintiff that she had notified both Sgt. Sudler and Sgt. Madara about the incident and what was said about Plaintiff.

289.    At all times material, Sgt. Madara was the direct supervisor of both OFC. DONAHUE and OFC. REYES.

290.    Cpl. Brooks told Plaintiff that both Sgt. Madara and Sgt. Sudler said that they had heard Plaintiff had tried to make Officer Lane handle the arrest and that Plaintiff refused to help him.

291.    Cpl. Brooks told Plaintiff that she told Sgt. Madara and Sgt. Sudler that Plaintiff handled the arrest properly and that she felt OFC. DONAHUE and OFC. REYES acted unprofessionally.

292.    In the days immediately after Cpl. Brooks informed Plaintiff about what OFC. DONAHUE and OFC. REYES had said about her, no one said anything to Plaintiff about the incident.

293.    Neither Sgt. Madara nor Sgt. Sudler said anything to Plaintiff about the incident.

294.    Recognizing that nothing would be done if she did not report the incident herself, around May 6, 2021, Plaintiff submitted a EEO Complaint regarding the statements made by OFC. DONAHUE and OFC. REYES. Specifically, Plaintiff's EEO Complaint stated:

> ON 05/01/21 A CAP FORM WAS ISSUED TO (B/M TARIK NASSIR). MYSELF AND OFFICER LANE #9618 ARRESTED MR. NASIR FOR VIOLATION OF A PFA ORDER. P/O DONAHUE AND REYES #2363 WAS UPSET ABOUT HAVING TO TRANSPORT THE PRISONER. AFTER BEING RELEASED, MR. NASIR RETURNED TO THE 22ND DISTRICT TO COMPLAINT ABOUT THE INAPPROPRIATE BEHAVIOR OF P/O DONAHUE #2858 AND REYES #2363. CORPORAL BROOKS #8348 HAS BODY CAMERA FOOTAGE THAT WILL CONFIRM THE MANNER IN WHICH THESE OFFICERS TALKED ABOUT ME TO THIS CIVILIAN. SERGEANT MADARA INFLUENCED THESE OFFICERS TO BEHAVE IN A HARASSING AND RETALIATORY MANNER TOWARDS ME. THIS IS ANOTHER EXAMPLED OF HOW MY COLLEAGUES TRY TO DISCREDIT MY NAME AND WORK ETHIC. THEIR UNPROFESSIONAL BEHAVIOR COULD HAVE CREATED AN UNSAFE SITUATION FOR ME. SERGEANT SUDLER AND SERGEANT MADARA WAS NOTIFIED ABOUT THE INCIDENT AND FAILED TO DO ANYTHING TO CORRECT THESE OFFICERS BEHAVIOR.

295.    Around June 7, 2021, Plaintiff was interviewed by the PPD's EEO Office regarding her May 6, 2021 EEO Complaint about OFC. DONAHUE and OFC. REYES.

296.    During this interview, Plaintiff testified to all the retaliation and harassment that she had experienced in the nearly six months since she filed her January 2021 Charge.

297.    Plaintiff testified that she was being harassed and retaliated against by nearly everyone in the 22nd District, from OFC. DONAHUE and OFC. REYES all the way up to CAPT. AKIL.

298.    As is customary practice in the PPD, CAPT. AKIL was notified about Plaintiff's May 6, 2021, EEO Complaint, and was aware of Plaintiff's June 7, 2021, interview with the EEO Office.

299.    Around June 22, 2021, Lt. Landherr presented Plaintiff with a notice indicating that "The Commanding Officer of the 22nd District [CAPT. AKIL] has ordered an investigation of events in which you are the target."

300.    CAPT. AKIL's inaction with respect numerous instances of much more serious misconduct by other officers in the 22nd District made clear the retaliatory motive in his actions to order a disciplinary investigation against Plaintiff.

301.    The only difference is that Plaintiff was the only officer who had raised complaints about CAPT. AKIL and other officers in the 22nd District.

302.    CAPT. AKIL's actions to order a formal investigation against Plaintiff nearly three months after the actual incident occurred fit neatly into the pattern of retaliation that Plaintiff has experienced ever since she participated as a witness in the EEO Complaint of another officer against SGT. SANTIAGO more than three years ago.

303.     Indeed, just two weeks earlier, Plaintiff had provided a sworn statement to the PPD's EEO Office detailing misconduct by multiple officers in the 22nd District, including CAPT. AKIL.

### JULY – SEPTEMBER 2021

304.     On July 2, 2021, Plaintiff received a written notice from the ERU informing her that the investigation of her May 2020 EEO Complaint regarding being physically assaulted by SGT. SANTIAGO was complete and was sustained.

305.     Specifically, the notice stated in relevant part:

> The purpose of this letter is to inform you the investigation has been completed and determined Sgt Santiago's conduct to be in violation of the afore-mentioned policies.

> Specifically, the investigation found Sgt Santiago engaged in intimidating verbal and physical conduct with you.

306.     Around August 11, 2021, when Plaintiff returned from vacation, Plaintiff noticed that incident reports she had submitted months earlier had been marked rejected by Cpl. Brooks and Sgt. Madara in the computer system.

307.     At all times material prior to August 11, 2021, Plaintiff had never had any of her police reports rejected by a supervisor.

308.     Moreover, the reports that had been rejected were prepared in the same way as other similar reports that were approved, and the reports were rejected for lacking information that was clearly included in the report had it been read in its entirety.

309.     At all times material, it was a near-universal practice for a supervisor to notify an officer under their supervision that a report was insufficient before it was formally rejected in the computer system.

310.    The reason for this practice was both a matter of professional courtesy and practicality – rejecting reports made the officer look bad, and it created more work for the supervisor.

311.    Indeed, the only reason why a supervisor would reject a report in the system without notifying the officer and giving them an opportunity to correct the report would be to make that officer look like they weren't doing their job.

312.    This is especially so in Plaintiff's case because she has more than 15 years of experience and had never had multiple police reports rejected by a supervisor – much less months after they were submitted.

313.    Plaintiff noticed that all of the rejected reports were for incidents that occurred shortly after her June 7, 2021, interview with the EEO Office during which she had directly accused both Cpl. Brooks and Sgt. Madara of failing to take action to address the misconduct of OFC. DONAHUE and OFC. REYES.

314.    Around August 13, 2021, a few days after Plaintiff discovered Cpl. Brooks and Sgt. Madara had been rejecting her police reports, Plaintiff was interviewed by Lt. Landherr as part of CAPT. AKIL's retaliatory investigation against her.

315.    On September 1, 2021, Lt. Landherr presented Plaintiff with a "75-18" – formal notice of disciplinary action – notifying her that CAPT. AKIL had charged her with multiple violations of the PPD Code of Conduct.

316.    Specifically, CAPT. AKIL had charged Plaintiff with:

    a.  **1-§014-10 - Fighting/Quarreling While on Duty**

    b.  **4-§-002-10 - Refusal to Promptly Obey Proper Orders from A Superior Officer**

317.    CAPT. AKIL charged Plaintiff with disciplinary violations that carried potential penalties of anywhere from 5 to 40 days of suspension.

318.    Additionally, CAPT. AKIL marked that Plaintiff would not be permitted to use vacation time to cover whatever penalty was ultimately imposed.

319.    As a result, Plaintiff would not only have a record of serious disciplinary charges on her record making it nearly impossible to advance in her career, but she would also face the risk of losing up to 40 days of pay.

320.    In contrast, CAPT. AKIL took no action to formally investigate or discipline much more serious misconduct by other officers in the 22nd District such as Sgt. Cherry's dangerous mishandling of a firearm, allegations that Sgt. Madara permitted officers to steal time, OFC. DONAHUE and Ofc. Reyes openly disparaging Plaintiff to a suspect under arrest, or the quarreling between LT. HARASKIEWIEZ and Lt. Mirabella.

321.    Once again, Plaintiff became the target of especially harsh disciplinary action based on a minor, one-time incident while far more serious misconduct went unaddressed.

322.    Once again, the only difference was that Plaintiff was the only one who had raised complaints about misconduct within the 22nd District.

323.    Around September 29, 2021, Plaintiff elected to report for duty on a day that she had previously scheduled as a vacation day.

324.    When Plaintiff reported to roll call, Lt. Landherr asked if there were any officers that did not have assignments.

325.    When Plaintiff raised her hand, Lt. Landherr paused for a second with a puzzled expression before asking: "What's your name?"

326.    Plaintiff did not immediately respond because she thought it was a joke.

327.    Lt. Landherr stood stone-faced before asking Plaintiff what her name was again which prompted snickers from the other officers in the room.

328.    Lt. Landherr's actions served no other purpose than to humiliate and belittle Plaintiff in front of everyone in the role call room.

329.    The above are just some of the examples of unlawful harassment and retaliation to which CAPT. AKIL and other officers in the 22nd District subjected Plaintiff because of her prior protected activity.

330.    Plaintiff claims that some or all of the harassing and retaliatory conduct set forth in this Amended Charge was intended to dissuade Plaintiff from pursuing her January 2021 Charge, and internal EEO Complaints against CAPT. AKIL and other officers in the 22nd District.

331.    Plaintiff claims a continuous practice of harassment and retaliation and all claims herein under the continuing violations doctrine.

332.    At all times material, Plaintiff acted under a reasonable, good-faith belief that conduct set forth herein violated Plaintiff's legally protected right to be free from harassment and retaliation in the workplace.

333.    At all times material, Plaintiff opposed the harassing and retaliatory conduct set forth in this Charge and made good-faith efforts to take corrective action the through the channels available to her as an employee of the City of Philadelphia/PPD.

334.    At all times material, Plaintiff endured the harassing and retaliatory conduct set forth in this Charge as conditions of her continued employment with the City and PPD.

335.    At all times material, the conduct set forth in this Amended Charge created a hostile work environment in which Plaintiff was subjected to severe, pervasive and unreasonable verbal abuse, humiliation, and disciplinary action because of Plaintiff's January 2021 Charge and

Plaintiff's opposition to the unlawful employment practices of CAPT. AKIL and other officers in the 22nd District.

336.    At all times material, Defendant knew or should have known that the harassing and retaliatory conduct towards Plaintiff set forth in this Amended Charge was unlawful, and Defendant failed to take prompt remedial action to prevent further harassment and retaliation against Plaintiff.

337.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other nonpecuniary losses. Plaintiff has further experienced severe emotional and physical distress and aggravation, activation, and/or exacerbation of any preexisting condition.

338.    Plaintiff further claims constructive and/or actual discharge to the extent Plaintiff is terminated or forced to resign from Plaintiff's position as a result of the unlawful harassment and retaliation.

339.    In the event Defendants claim or a Court determines that Plaintiff is an Independent Contractor, Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendant owed and breach its duty to Plaintiff to prevent the harassment and/or retaliation and is liable therefore for negligence.

## COUNT I
**Retaliation in Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.*
*(Plaintiff v. Defendant City of Philadelphia only)*

340.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

341.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer "(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

342.    At all times material, Plaintiff acted under a reasonable, good-faith belief that Plaintiff's legally protected right to be free from retaliation and harassment in the workplace was being violated by Defendant's conduct as alleged herein.

343.    Plaintiff engaged in protected activity under Title VII including, but not limited to, offered testimony in the EEO complaint filed by another police officer, opposing Defendant's unlawful employment practices, filing and pursuing multiple claims through Defendant's EEO complaint process, and filing two charges of discrimination with the EEOC.

344.    Defendant City of Philadelphia, by and through its agents and employees, subjected Plaintiff to the materially adverse conduct alleged herein in direct response to Plaintiff's protected activity as alleged herein.

345.    At all times material, Defendants' materially adverse conduct towards Plaintiff in retaliation for Plaintiff's protected activity was sufficiently serious that it would dissuade a reasonable employee in Plaintiff's position from making or supporting EEO claims against Defendant.

43

346.   At all times material, Management's materially adverse actions against Plaintiff as alleged in this Complaint were intended to dissuade Plaintiff from pursuing her EEO claims against Defendants.

347.   Management's materially adverse actions against Plaintiff all had the effect of altering the terms and conditions of Plaintiff's employment with Defendant.

348.   At all times material, Plaintiff's protected activity was the determinative factor in some or all of Defendant's materially adverse actions against Plaintiff.

349.   At all times material, Plaintiff's protected opposition activity was the but-for cause of some or all of Defendant's materially adverse actions against Plaintiff.

350.   The temporal proximity between Plaintiff's protected activity and Defendant's decisions to take materially adverse action against Plaintiff is unusually suggestive of a retaliatory motive and gives rise to an inference of causation.

351.   Defendant's materially adverse actions against Plaintiff in retaliation for Plaintiff's opposition to their unlawful employment practices was intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

352.   Defendant's materially adverse actions against Plaintiff in retaliation for Plaintiff's protected opposition activity are unlawful employment practiced in violation of Title VII.

353.   As a result of Defendants' retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered and continues to suffer emotional and financial harm.

## COUNT II

**Retaliatory Hostile Work Environment In Violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*,**

***(Plaintiff v. Defendant City of Philadelphia only)***

354.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

355.    Retaliatory hostile work environment claims are cognizable under Title VII. *See Komis v. Sec'y of United States Dep't of Lab.,* 918 F.3d 289, 293 (3d Cir. 2019).

356.    As alleged herein, Defendant subjected Plaintiff to materially adverse employment actions in retaliation for Plaintiff's protected activity.

357.    At all times material, Defendant's conduct was not welcomed by Plaintiff.

358.    At all times material, Defendant's conduct towards Plaintiff was motivated by Plaintiff's protected activity and Defendant acted with an intent to retaliate.

359.    At all times material, Defendant's retaliatory conduct as alleged herein was so severe or pervasive that a reasonable employee in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

360.    At all times material, Plaintiff subjectively believed her work environment to be hostile or abusive as a result of Defendant's retaliatory conduct.

361.    At all times material, Plaintiff opposed the retaliatory conduct of the named Defendants, and made good-faith efforts to take corrective action the through the channels available to her as an employee of Defendant.

362.    At all times material, Defendant knew or should have known about the unlawful harassment and discrimination against Plaintiff by its employees or agents, and Defendant failed to take prompt remedial action.

363.     At all times material, the conduct alleged in this Complaint created an actionable retaliatory hostile work environment.

364.     The unlawful hostile work environment created by Defendant detrimentally affected Plaintiff and would have detrimentally affected a reasonable person in Plaintiff's position.

365.     As alleged herein, the hostile work environment created and condoned by the named Defendants is an unlawful employment practice in violation of Title VII.

366.     Defendant's unlawful employment practices were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

367.     As a result of Defendant's unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered and continues to suffer emotional and financial harm.

### COUNT III
### Retaliation
### In Violation of 42 U.S.C. § 1983
### (*Plaintiff v. All Defendants*)

368.     Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

369.     The First Amendment gives persons the right to petition the Government for a redress of grievances. U.S. Const. amend. I.

370.     "[R]etaliation by a government employer for a public employee's exercise of the right of access to the courts may implicate the protections of the Petition Clause." *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011); *see also Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016) (holding that an inmate's oral grievance is protected under the Petition Clause).

371.    To be protected under the First Amendment, speech by a government employee "must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Waters v. Churchill*, 511 U.S. 661, 668 (1994).

372.    Here, Plaintiff engaged in activity that was protected by the First Amendment's Petition Clause.

373.    Plaintiff's protected speech was made as a citizen, and not as part of her duties as a Police Officer.

374.    Plaintiff protected speech was on a matter of public concern.

375.    Defendants took materially adverse employment actions against Plaintiff for engaging in protected speech activity.

376.    Plaintiff's protected activity was a substantial or motivating factor in Defendants' decisions to take materially adverse actions against Plaintiff.

377.    Defendants cannot show any legitimate nondiscriminatory reason for its employment practices and any reasons proffered by Defendants for their actions against Plaintiff are pretextual and can readily be disbelieved.

378.    Defendants acted upon a continuing course of conduct.

379.    Moreover, this case unquestionably involves official policy: the City, the PPD, and their policymaking officials (1) directed that the violations occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

380.    Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights and as a result there should be an award of punitive damages against Defendants.

381.    As a result of Defendants' violations of Plaintiff's Free Speech rights, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**COUNT IV**
**Hostile Work Environment**
**In Violation of 42 U.S.C. § 1983**
***(Plaintiff v. All Defendants)***

382.    Plaintiff incorporates by reference and realleges every allegation in this Complaint as if fully set forth herein at length.

383.    Defendants SANTIAGO, AKIL, and CONWAY, in their capacity as employees and agents of the City of Philadelphia, intentionally retaliated against Plaintiff in the terms and conditions of her employment on the basis of Plaintiff's constitutionally protected activity.

384.    The City delegated to Defendants SANTIAGO, AKIL, and CONWAY the authority to control and materially alter Plaintiff's work environment, and Defendants SANTIAGO, AKIL, and CONWAY abused that authority to create a hostile work environment.

385.    At all times material, Defendants' intentional, retaliatory conduct was not welcomed by Plaintiff.

386.    At all times material, the intentional, retaliatory conduct by Defendants SANTIAGO, AKIL, and CONWAY was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

387.    At all times material, Plaintiff believed her work environment to be hostile or abusive as a result of Defendants' retaliatory conduct.

388.    The hostile work environment alleged herein unreasonably interfered with Plaintiff's work performance.

389.    The hostile work environment alleged herein was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

390.    Defendants acted under color of state law.

391.    Defendants violated Section 1983 by intentionally retaliating against Plaintiff on the basis of her constitutionally protected activity sufficient to create a hostile work environment.

392.    Defendants' unlawful actions towards Plaintiff were intentional, willful, and made with reckless indifference to Plaintiff's federally protected civil rights.

393.    Defendants failed to exercise reasonable care to prevent retaliatory harassment in the workplace by failing to establish an explicit policy against harassment in the workplace, failing to fully communicate the policy to its employees, failing to provide a reasonable way for Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiff.

394.    Defendants acted upon a continuing course of conduct.

395.    As a result of Defendants' violations of Plaintiff's rights, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the named Defendants, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, statutory damages, attorneys' fees, costs, interest, and disbursements of action; and for such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: <u>October 14, 2022</u>                    **LAW OFFICES OF ERIC A. SHORE**

**CHARLES M. SCOTT, ESQUIRE**
Attorney ID No.: 326926
2 Penn Center, Suite 1240
1500 Market Street
Philadelphia, PA 19102
(267) 262-8586
charless@ericshore.com
*Attorney for Plaintiff*